Alan **BUCK** and Frank
**Bigenho, Plaintiffs,**

v.

**PUERTO RICO SYMPHONY ORCHESTRA CORPORATION,
et al., Defendants.**

**Civ. No. 90–2618 (PG).**

United States District Court,
D. Puerto Rico.

April 20, 1994.

</div>

Enrique J. Mendoza Méndez, Santurce, PR, for plaintiffs.

Yolanda V. Toyos Olascoaga, San Juan, PR, Carlos Berretaga, Hato Rey, PR, Mayra Maldonado, Dept. of Justice, San Juan, PR, Manuel Alvarado, Santurce, PR, for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

### I.

### Facts and Procedural History

Plaintiffs were hired in 1987 to serve as violinists in the Puerto Rico Symphony Or-

chestra ("PRSOC"). Pursuant to the terms of a labor agreement between the American Federation of Musicians and the PRSOC, on January 19, 1990, plaintiffs applied by audition for tenured positions with the PRSOC. The audition committee consisted of Odón Alonso, José Figueroa, Joaquín Vidaechea, Federico Silva, and Francisco Morlá. Plaintiffs failed the audition, but were granted a second audition on March 23, 1990. The second audition committee was comprised of the same members, with the exception of Guillermo Figueroa's presence and Vidaechea's absence. Defendant Griselle Báez Muñoz, PRSOC director, attended the second audition, allegedly distributing and collecting the ballots. The audition committee again denied plaintiffs tenure. Plaintiffs filed an arbitration complaint. On April 17, 1990, defendant Báez offered plaintiffs a contract to remain with PRSOC until December 31, 1990, by which time the parties anticipated that the arbitration complaint would be resolved. Although the arbitration complaint was not resolved, on January 4, 1991, defendant Báez discharged plaintiffs from employment with PRSOC.

Plaintiffs brought suit against PRSOC; PRSOC's parent, the Musical Arts Corporation ("CAM"); Báez; Carlos Alicea, Director of PRSOC until February 28, 1990; Jorge Martínez Solá, Executive Director of CAM until May 15, 1991; and all members of both audition committees. Plaintiffs allege that the audition committee members discriminated against plaintiffs because plaintiffs are not of Puerto Rican or Hispanic ancestry; that defendant Báez participated in the second audition in a manner contrary to the traditions and practices of PRSOC, and later discharged plaintiffs prior to the conclusion of the arbitration proceeding; and that defendant Martínez was aware of Báez' actions.[1]

This case has steadily worn a trail between the judge to whom it was assigned until recently, and the magistrate judge on whose shoulders fell the lion's share of the work. Without delving into the details of the case's arduous journey, suffice it to say that among the motions pending in this case are the following:

| Docket # | Motion (party) | Filing Date |
|---|---|---|
| 56 | Motion for summary judgment (D) | May 6, 1992 |
| 71 | Opposition (P) | June 26, 1992 |
| 77 | Leave to reply to opposition (D) | July 6, 1992 |
| 86 | Magistrate's Report and Recommendation | May 21, 1993 |
| 89 | Objections (P) | June 1, 1993 |
| 92 | Objections (D) | June 9, 1993 |
| 93 | Objections (D) | June 11, 1993 |

Defendants CAM and PRSOC moved for summary judgment on the basis that they are entitled to sovereign immunity under the Eleventh Amendment, and therefore are protected from an action for damages. Defendants CAM, PRSOC, Alicea, Alonso, Báez, and Martínez moved for summary judgment on the grounds that plaintiffs did not possess property interest sufficient to trigger due process protections. The same defendants moved for summary judgment "on the merits," apparently alleging that plaintiffs failed to state a claim. Defendants Alicea, Alonso, Báez, and Martínez also moved for summary judgment on the basis that they are protected by qualified immunity from plaintiffs' claims in this litigation.[2]

The magistrate judge found that CAM and PRSOC were not entitled to sovereign immu-

---

**1.** Plaintiffs acknowledge that defendant Alicea was not culpable in any of the wrongs allegedly perpetrated against plaintiffs, and request that their claims against Alicea be dismissed. Defendants have requested that dismissal be ordered "with prejudice" (Docket # 75). Plaintiffs have opposed (Docket # 78).

Because I hold today that defendants Báez and Martínez are entitled to qualified immunity, and

therefore dismiss plaintiffs' claims as to them with prejudice, I also grant defendants' motion with respect to Carlos Alicea, and dismiss with prejudice the claims against him.

**2.** Audition committee members José Figueroa, Joaquín Vidaechea, Federico Silva, Francisco Morlá, and Guillermo Figueroa have not moved for summary judgment.

.. no.

nity, and recommended that the motion for summary judgment be denied as to these defendants. The magistrate judge also found that defendants Alicea, Báez, and Martínez—but not defendant Alonso—should be shielded from this action by a grant of qualified immunity, and recommended that the motion for summary judgment is granted as to the former three defendants and denied as to the latter. I agree with some, but not all, aspects of the magistrate judge's Report and Recommendation. . Thus, for the reasons set forth below, defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.

## II.

### *The Eleventh Amendment*

#### A.

#### *Discussion*

■ The Eleventh Amendment was enacted in response to the Supreme Court's decision in *Chisholm v. Georgia*, holding that a South Carolina citizen could bring an action against the State of Georgia in federal court. 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793).[3] The Eleventh Amendment has been construed to guard a state against claims brought in federal court by citizens of that or any other state. *Employees of Dept. of Public Health & Welfare v. Dept. of Public Health & Welfare*, 411 U.S. 279, 280, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973).[4] A state may by express statement waive the sovereign immunity protected by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974). Sovereign immunity under the Eleventh Amendment extends beyond the core of the state government to "arms of the state." *Metcalf & Eddy v. Puerto Rico Aqueduct & Sewer*

*Authority*, 991 F.2d 935, 939 (1st Cir.1993). CAM and PRSOC seek a determination that they are "arms of the state," immune from suit.

#### B.

#### *The Test*

■ I must determine the extent to which CAM and PRSOC are "entangled" with the government, *Metcalf & Eddy*, 991 F.2d at 940. Factors relevant to the general issue of an institution's autonomy with respect to the government include the following:

(1) whether the agency has the funding power to enable it to satisfy judgments without direct state participation or guarantees; (2) whether the agency's function is governmental or proprietary; (3) whether the agency is separately incorporated; (4) whether the state exerts control over the agency, and if so, to what extent; (5) whether the agency has the power to sue, be sued, and enter contracts in its own name and right; (6) whether the agency's property is subject to state taxation; and (7) whether the state has immunized itself from responsibility for the agency's acts or omissions.

*Metcalf & Eddy*, 991 F.2d at 939–40. These factors provide grounds on which to evaluate whether the entity "acted more like a private company, or more like the Commonwealth's government" in the circumstances from which arose plaintiff's claim. *Royal Caribbean v. Puerto Rico Ports Authority*, 973 F.2d 8, 10 (1st Cir.1992).

#### C.

#### *Applying the Test*

■ **1.** **Finances.**[5] The Eleventh Amendment has been construed to prohibit

---

3. According to the Amendment,
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
U.S. Const. amend. XI.

4. The Eleventh Amendment applies to Puerto Rico "in the same manner, and to the same extent as if Puerto Rico were a state." *De Leon*

*Lopez v. Corporacion Insular de Seguros*, 931 F.2d 116, 121 (1st Cir.1991).

5. *See supra* at section II.B., list of seven issues that may be considered in an "arm of the state" analysis, from *Metcalf & Eddy*, 991 F.2d at 939–40. The first issue included in the list is "whether the agency has the funding power to enable it to satisfy judgments without direct state participation or guarantees." *Id.*

the expenditure of public funds to satisfy a judgment against a state in federal court. *See, e.g.; Metcalf & Eddy,* 991 F.2d at 939 ("The Eleventh Amendment's primary concern is to minimize federal courts' involvement in disbursal of the state fisc.") Thus, "arm of the state" analyses consistently have explored the issue of whether a judgment against an entity claiming sovereign immunity will be satisfied by the Commonwealth treasury. *See, e.g., Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974); *see also University of Rhode Island v. A.W. Chesterton Co.,* 2 F.3d 1200, 1203 n. 4 (1st Cir.1993) ("... Eleventh Amendment analysis normally would focus primary attention on any financial *drain* on the State treasury caused by a judgment adverse to" defendant.) (emphasis in original).

In deciding the issue before me today, I must negotiate terrain bounded by *In re Dupont Plaza Hotel Fire Litigation,* 888 F.2d 940 (1st Cir.1989), and *Metcalf & Eddy, supra,* in which the Circuit took slightly different approaches to the "arm of the state" analysis. The court decided *Metcalf & Eddy* without explicitly hewing to the line of *Dupont Plaza* because the circumstances of the cases varied with respect to essential factors. Thus, *Dupont Plaza,* illuminated by the contrast of *Metcalf & Eddy,* provides guidance for the resolution of today's controversy.

In *Dupont Plaza,* the court held that the Puerto Rico Tourism Company was an arm of the Commonwealth. 888 F.2d at 943. The court supported the district court's findings that despite being authorized to raise funds independent of the government, "the Tourism Company does not operate for profit, and that 72.9 percent of its budget came from the general funds of Puerto Rico." *Id.* The court reasoned on the basis of these findings that "a judgment enforced against the Tourism Company is effectively a liability

of the Commonwealth." *Id.* at 944. In addition, the court noted that the Governor of Puerto Rico selects the Board of Directors of the Tourism Company, and that the "Governor's office exercises significant supervisory powers over the Tourism Company." *Id.* The court also found that the Tourism Company was authorized to "control its own properties and funds [and] ... enter into contracts...." *Id.* (citing 23 P.R.Laws Ann., § 671d(f), (g)). The Tourism Company additionally is empowered to issue bonds, *Dupont Plaza. Id.* (citing 23 P.R.Laws Ann., § 671d($l$)). Although the Tourism Company may "sue and be sued," the court held that the statutory provision to this effect does not constitute the express waiver of the Eleventh Amendment that is required for a state to consent to suit. *Id.* at 944–45 (quoting *Culebras Enterprises Corp. v. Rivera Rios,* 813 F.2d 506, 517 n. 9 (1st Cir.1987)). And although the Legislature disclaimed by statute debts incurred by the Tourism Company, the court held that this disclaimer was "effectively" meaningless in the face of the Tourism Company's high level of government funding. *Id.* at 943–44. Thus, the court held that the Tourism Company's economic reliance on the government, coupled with additional governmental controls, made the Tourism Company an arm of the Commonwealth despite the Tourism Company's statutorily-authorized autonomy with respect to contracts, property, involvement in litigation, and obligation for its own debts. The court upheld the district court's grant of sovereign immunity to the Tourism Company. *Id.* at 943.

If *Dupont Plaza* were the only relevant case in our Circuit, or the most recent, I would have little hesitation in finding that CAM and PRSOC are arms of the Commonwealth entitled to immunity under the Eleventh Amendment. The Commonwealth provided seventy-five percent of the funds in CAM's 1989–90 budget, and eighty-seven percent of the funds in PRSOC's budget for that year.[6] Like the Tourism Company,

---

6. Defendants provided the following information in their statement of uncontested facts:

CAM's budget

| Fiscal Year | Total | Percentage from legislative funds |
|---|---|---|
| 1988–89 | $1,003,453 | 76% |
| 1989–90 | 1,016,613 | 75% |
| 1991–92 | 1,032,000 | 79% |

CAM and PRSOC have statutory authority to raise funds from other sources, but enjoy little success in doing so. Based on the court's reasoning in *Dupont Plaza*, then, a judgment entered against CAM and PRSOC in the instant case would be "effectively a liability of the Commonwealth." *Dupont Plaza* at 944.

In addition, other aspects of the Commonwealth's influence over and control of CAM and PRSOC are analogous to the government's relationship with the Tourism Company, according to the findings set forth in *Dupont Plaza*. The Governor selects CAM's Board of Directors. 18 P.R.Laws Ann., § 1165a (1989). CAM and PRSOC may "control [their] own properties and funds [and] ... enter into contracts...." 18 P.R.Laws Ann., § 1165b(*o*) (1989); 18 P.R.Laws Ann., § 1162a(i) (1989). Like the Tourism Company, defendants may "sue and be sued." [7] 18 P.R.Laws Ann., § 1165b(j) (1989); 18 P.R.Laws Ann., § 1162a(e) (1989). According to statute, CAM's debts and obligations are not guaranteed by the Commonwealth treasury. 18 P.R.Laws Ann., § 1165k (1989).[8]

Thus, under the rule I derive from *Dupont Plaza*, the resolution would be inescapable: CAM and PRSOC are arms of the Commonwealth entitled to share the protection afforded the Commonwealth by sovereign immunity because both CAM and PRSOC receive a large proportion of their funds from the government, because the Governor is authorized to select CAM's Board of Directors, and in spite of aspects of defendants' organic statutes that reflect separation between defendants and the government. *See also Perez v. Rodriguez Bou*, 575 F.2d 21, 25 (1st Cir.1978) ("The extent and nature of the Commonwealth of Puerto Rico's financial support for the University of Puerto Rico and the fact that the Commonwealth appoints the governing body of the University convinces us that the University is sufficiently an 'arm' of the state ... to be immune from damage suits under the Eleventh Amendment.") [citations omitted]. In *Dupont Plaza*, then, the court focused on the Tourism Company's financial dependence on the Commonwealth.

In *Metcalf & Eddy*, the First Circuit narrowed its focus. Without citing *Dupont Plaza*, the court focused on the issue of whether the Commonwealth had a *legal obligation* to satisfy a judgment against the defendant, or whether the Commonwealth was legally required to permit defendant to withdraw public funds to satisfy an adverse judgment. *Metcalf & Eddy*, 991 F.2d at 940 (agency's "access to the Commonwealth's treasury" is the "principal issue" in evaluating "arm of the state" claim). The court noted that PRASA received a small proportion of its funds from the Commonwealth. *Id.* The court held that defendant Puerto Rico Aqueduct and Sewer Authority ("PRASA") was not an arm of the Commonwealth because PRASA was unable to draw at its own whim funds from the Commonwealth treasury. *Id.* at 940–41. ("The government does not give PRASA a blank check or an indeterminate carte blanche allowing it to draw on the public treasury as it thinks necessary. Thus, control of the money flow from tax dollars is unilateral...."); *id.* at 941 ("... PRASA's inability to draw on the public fisc cripples its immunity defense...."); *id.* at 942–43 ("First, and most fundamentally, PRASA's inability to tap the Commonwealth treasury or pledge the Commonwealth's credit leaves it unable to exercise the power of the purse. On this basis, PRASA is ill-deserving of

PRSOC's budget

| Fiscal Year | Total | Percentage from legislative funds |
|---|---|---|
| 1988–89 | $2,689,483 | 85% |
| 1989–90 | 2,754,511 | 87% |
| 1991–92 | 2,261,000 | 89% |

Defendants did not provide information regarding the budgets of CAM and PRSOC for Fiscal Year 1990–91.

7. *See supra* at section II.B., list of seven issues that may be considered in an "arm of the state"

analysis, from *Metcalf & Eddy*, 991 F.2d at 939–40. The fifth issue included in the list is "whether the agency has the power to sue, be sued, and enter contracts in its own name and right." *Id.*

8. *See supra* at section II.B., list of seven issues that may be considered in an "arm of the state" analysis, from *Metcalf & Eddy*, 991 F.2d at 939–40. The seventh issue included in the list is "whether the state has immunized itself from responsibility for the agency's acts or omissions." *Id.*

Eleventh Amendment protection."); *id.* at 943 (PRASA's request for sovereign immunity denied because of "[t]he profound impact of PRASA's inability to reach the Commonwealth's treasury....").

The court's emphatic language suggests that *Metcalf & Eddy* stands for the proposition that an entity may be deemed an arm of the state for Eleventh Amendment purposes only if the entity may draw funds from the state treasury to satisfy a judgment against the entity. If the government *must* stand behind a judgment against an entity, the entity will be cloaked in the state's sovereign immunity. *Id.* at 939 ("Generally, if a state has a legal obligation to satisfy judgments against an institution out of public coffers, the institution is protected from federal adjudication by the Eleventh Amendment.") (citing *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Reyes v. Supervisor of DEA,* 834 F.2d 1093, 1097–98 (1st Cir.1987)). If the government has not pledged funds to cover the entity's liabilities, and if the entity is not empowered unilaterally to draw on the government's funds, the entity is not an arm of the state and is not entitled to sovereign immunity under the Eleventh Amendment.

*Metcalf & Eddy* may be seen, then, as a retreat from the court's quantitatively-based analysis in *Dupont Plaza.* Indeed, *Metcalf & Eddy* turns on its head the *Dupont Plaza* rule: whereas the court in *Dupont Plaza* placed greatest emphasis on the amount of funds flowing in the standard budgetary stream from the government to the entity, the *Metcalf & Eddy* court elevates to a position of primacy the government's obligation to respond to a judgment against the entity.

On the basis of the *Metcalf & Eddy* rule as I have described it, CAM and PRSOC may not be treated as arms of the Commonwealth. Like PRASA, neither CAM nor PRSOC may obtain public funds without the acquiescence of the government.

For several reasons, however, *Metcalf & Eddy* does not require this result in the present case. Most importantly, the facts of *Dupont Plaza* are significantly more analogous to those of the present case than are the facts of *Metcalf & Eddy.* As noted earlier, like the Tourism Company, CAM and PRSOC were heavily reliant on Commonwealth funding from 1988 to 1992.[9] In contrast, PRASA received a small proportion of its funds from the Commonwealth. As the court recognized, "Although the central government subsidizes the agency to some extent, PRASA relies mostly on user fees and bonds to support its operations." *Metcalf & Eddy,* 991 F.2d at 940.[10]

In addition, the court in *Metcalf & Eddy* did not cite the *Dupont Plaza* opinion. There is no reason to believe that the *Metcalf & Eddy* court intended silently to prohibit future application of *Dupont Plaza.* The facts of the two cases are sufficiently distinguishable that the disparate rules of the two cases may co-exist without contradiction.[11]

**9.** *See supra* n. 6.

**10.** PRASA's separation from the Commonwealth government is emphasized by the court's finding that the government was required to pay the "user fees" charged by PRASA. *Metcalf & Eddy,* 991 F.2d at 942.

**11.** I am further persuaded that the *Metcalf & Eddy* court did not overrule *Dupont Plaza,* despite the court's shift of attention from the extent of defendants' reliance on government funds, because several aspects of the opinion in *Metcalf & Eddy* reflect the court's recognition of the relevance of this factor in an "arm of the commonwealth" analysis. For example, the court lists as a factor relevant to an "arm of the state" analysis an agency's "funding power," rather than its "access to the state's treasury," the factor described in the opinion's text as the most important factor. *See infra* section II.B. In addition,

the court repeatedly referred to PRASA's financial self-sufficiency. *See e.g., Metcalf & Eddy,* 991 F.2d at 940 ("... PRASA relies mostly on user fees and bonds to support its operations."); *id.* at 942 (After describing aspects of PRASA's operation suggesting that PRASA's close links to, and dependence on, the government, holding that "[o]n the other side of the scale, a heftier array of indicators suggests that PRASA is distinct from Puerto Rico's central government. PRASA has the power to raise funds through user fees.... PRASA also has the right to raise funds by issuing revenue bonds independent of the central government." [citations omitted] ). Indeed, the court expressly recognized that "[t]he power and opportunity to generate a revenue stream and thereby finance an agency's operations is an important aspect of the agency's separate identity." *Id.* [citation omitted].

## 2. Governmental v. Proprietary Function.[12]

An entity may be granted the "Eleventh Amendment's protective swaddling," *Metcalf & Eddy*, 991 F.2d at 938, if it was acting more like the government than like a private company at the time of the incident giving rise to the lawsuit. *Royal Caribbean v. Puerto Rico Ports Authority*, 973 F.2d at 10 [citing *Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F.2d 1, 10 (1st Cir.1990)]. An agency's entitlement to Eleventh Amendment immunity may be contingent, in part, on the activity from which the claims arise. *See Metcalf & Eddy*, 991 F.2d at 941–42 n. 6 (recognizing the "seeming anomaly [that] a single agency [may] be ... held to possess Eleventh Amendment immunity for some functions but not for others.") Thus, the First Circuit has held that the Ports Authority is an arm of the Commonwealth in connection with its licensing of ship pilots, but is not an arm of the Commonwealth in connection with its responsibility for operating Puerto Rico's docks. *Compare M/V Manhattan Prince*, 897 F.2d at 9 *with Royal Caribbean*, 973 F.2d at 9. The Ports Authority "derives no revenue" from its licensing of pilots, *M/V Manhattan Prince*, 897 F.2d at 12, but generates substantial revenues from operating the docks, *Royal Caribbean*, 973 F.2d at 10. The court distinguished these cases by noting that the Ports Authority's dock-related activities are the profitable production and sale of goods, services, and property, in a manner akin to a private company, whereas the Ports Authority merely regulates the licensing of ship pilots, but does not reap economic benefits in that role. *Royal Caribbean*, 973 F.2d at 12. *See also Metcalf & Eddy*, 991 F.2d at 941–42, n. 6 (explaining the holding of *Royal Caribbean* ).

In the present case, I find that defendants were acting in a governmental role, rather than as a private entity, at the time of the incidents underlying this litigation. First, the language of CAM's enabling statute is pungent with implications that CAM is intertwined with the government of the Commonwealth. For example, CAM is charged with the responsibility of "administer[ing] the Commonwealth of Puerto Rico's programs" in the fields of music, musical arts, and stagecraft. 18 P.R.Laws Ann., § 1165b (1989). In addition, under specified circumstances CAM is described as an "intermediary agency," and distinguished from "other agencies of the Commonwealth of Puerto Rico." 18 P.R.Laws Ann., § 1165b(n) (1989). Finally, CAM is to coordinate the activities of government agencies whose objectives are similar to CAM's. 18 P.R.Laws Ann., § 1165b(t) (1989). Second, as the parties agree, CAM and PRSOC lean heavily on the Puerto Rico government for funding, annually deriving seventy-five percent to eighty-nine percent of their funding from the Commonwealth. The Legislature does not appear to have envisioned that CAM and PRSOC would operate as profit-making entities, and the entities indeed perform their functions without generating substantial revenue.

## 3. Other Factors.

CAM's and PRSOC's enabling statutes reflect various mechanisms by which the government controls the entities, impinging upon defendants' autonomy.[13] For example, CAM's Board of Directors is named, and the selection of its Executive Director approved, by the Governor. 18 P.R.Laws Ann., § 1165a (1989). The chairperson of the Board of Directors of the Institute of Puerto Rican Culture must be a member of CAM's Board. CAM's Board of Directors "exercise[s] all the powers of" PRSOC, including adoption of PRSOC's rules and appointment of a Director General of PRSOC. 18 P.R.Laws Ann., § 1162b (1989). PRSOC's budget request is submitted to CAM's Board of Directors, 18 P.R.Laws Ann., § 1162e (1989). CAM's budget request must be submitted to the Legislature via the Governor's office. 18 P.R.Laws Ann., § 1165i (1989). CAM's and PRSOC's bud-

12. *See supra* at section II.B., list of seven issues that may be considered in an "arm of the state" analysis, from *Metcalf & Eddy*, 991 F.2d at 939–40. The second issue included in the list is "whether the agency's function is governmental or proprietary." *Id.*

13. *See supra* at section II.B., list of seven issues that may be considered in an "arm of the state" analysis, from *Metcalf & Eddy*, 991 F.2d at 939–40. The fourth issue included in the list is "whether the state exerts control over the agency, and if so, to what extent." *Id.*

gets are included as in the Commonwealth's general budget. 18 P.R.Laws Ann., § 1165n (1989), 18 P.R.Laws Ann., § 1162e (1989). The Puerto Rico Comptroller is required to examine CAM's and PRSOC's financial records "from time to time," 18 P.R.Laws Ann., § 1165j (1989); 18 P.R.Laws Ann., § 1162a(i) (1989). The Director General of PRSOC must present an annual report to CAM, the Governor, and the Puerto Rico Legislature. 18 P.R.Laws Ann., § 1162d (1989). The Executive Director of CAM is required to provide an annual report to the Board of Directors, Governor, and Legislature. 18 P.R.Laws Ann., § 1165c (1989). The "internal organization" of CAM was to be established by the Executive Director in consultation with the Commonwealth Office of the Budget and Management, and subject to the ultimate approval of the Governor. 18 P.R.Laws Ann., § 1165h (1989). CAM and PRSOC are exempt from all Commonwealth taxes and license fees. 18 P.R.Laws Ann., § 1165g (1989).[14]

It is true that a variety of factors tend to reflect CAM's and PRSOC's independence from the government of the Commonwealth of Puerto Rico, thus supporting plaintiffs' contention that CAM and PRSOC are not arms of the state, and are not entitled to sovereign immunity under the 11th Amendment. CAM is a public corporation, "which shall function as an entity separate from the Government of the Commonwealth of Puerto Rico and its agencies...." 18 P.R.Laws Ann., § 1165a (1989).[15] CAM and PRSOC may establish standards and guidelines for achieving their objectives. 18 P.R.Laws Ann., § 1165b(a), (*l*) (1989); 18 P.R.Laws Ann., § 1162a(h) (1989). As noted earlier, CAM and PRSOC may sue and be sued, may enter contracts, and exercise absolute control over their properties, activities, and expenditures. 18 P.R.Laws Ann., § 1165b(j), (k), (o),

(p) (1989); 18 P.R.Laws Ann., § 1162a(e), (g), (i), (k) (1989). CAM may acquire, possess, administrate, and sell personal and real property. 18 P.R.Laws Ann., § 1165b(q) (1989). CAM may appoint and pay personnel and contract employees. 18 P.R.Laws Ann., § 1165b(s) (1989). Finally, as noted earlier, CAM's "debts and obligations shall not constitute debts or obligations of the Commonwealth of Puerto Rico ... and shall not encumber the funds of the Commonwealth Treasury." 18 P.R.Laws Ann., § 1165k (1989).[16]

### D.

### Conclusion

In conclusion, however, the First Circuit's precedents instruct me that defendants' attributes reflect a degree of governmental support and control characteristic of an "arm of the commonwealth." In the present case, where CAM and PRSOC, unlike PRASA, are not "mostly" self-sufficient, and cannot operate without the government's sustenance, and where CAM and PRSOC receive a greater proportion of their funds from the government than did the Tourism Company, I find that the elements suggesting defendants' autonomy from the government are not sufficient to defeat defendants' claims that they are arms of the state. CAM and PRSOC therefore are due sovereign immunity under the Eleventh Amendment, and are protected from plaintiffs' claims in this action.

### III.

### Qualified Immunity

 Qualified immunity shields government officials from personal liability for money damages for discretionary actions not violative of a clearly established statutory or constitutional right of which a reasonable

---

**14.** *See supra* at section II.B., list of seven issues that may be considered in an "arm of the state" analysis, from *Metcalf & Eddy*, 991 F.2d at 939–40. The sixth issue included in the list is "whether the agency's property is subject to state taxation." *Id.*

**15.** PRSOC, a "public corporation," is a subsidiary of CAM. 18 P.R.Laws Ann., § 1162 (1989). *See supra* at section II.B., list of seven issues that

may be considered in an "arm of the state" analysis, from *Metcalf & Eddy*, 991 F.2d at 939–40. The fourth issue included in the list is "whether the agency is separately incorporated." *Id.*

**16.** PRSOC's enabling statute does not include a statement disclaiming the Commonwealth's liability for PRSOC's debts.

person would have known. *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 704 (1st Cir.1993) (citing *inter alia Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Because plaintiffs fail even to allege that defendants Báez and Martínez violated plaintiffs' statutory or constitutional rights, Báez and Martínez are entitled to the protection of qualified immunity.

Plaintiffs allege that Báez violated "traditions and practices" of the PRSOC, namely by attending plaintiffs' second audition, and by participating in the audition by performing various ministerial functions. Martínez' transgression, according to plaintiffs, was his contact with Báez and his knowledge of her actions.

None of these activities, if proven, would constitute a violation of a statutory or constitutional right. National origin-based discrimination in an employment decision is, of course, violative of important rights of which any reasonable person would be aware. Plaintiffs have not suggested a plausible link, however, between Báez' and Martínez' actions and the discriminatory treatment to which plaintiffs allegedly were subjected.

Thus, I find that plaintiffs have not alleged that Báez or Martínez took actions that would make them ineligible for qualified immunity. Báez and Martínez are entitled to qualified immunity.

Defendant Alonso, however, is situated somewhat differently. Plaintiffs allege that as a member of the audition committees, Alonso's discriminatory animus against non-Puerto Ricans caused him to give low marks to plaintiffs' performances. If proven, defendant Alonso's actions would constitute national origin-based employment discrimination. Thus, defendant Alonso is not entitled to qualified immunity.

## IV.

### Conclusion

For the reasons set forth in this Opinion and Order, defendants CAM and PRSOC are "arms of the commonwealth" and are entitled to sovereign immunity. The allegations against defendants Báez and Martínez do not constitute statutory or constitutional viola-

tions, and these defendants are entitled to qualified immunity. Defendant Alonso is charged with violating plaintiffs' rights, and is not entitled to qualified immunity. Finally, Defendant Alicea is not charged with any wrongdoing, and plaintiffs request dismissal of the claims against him.

**THEREFORE,** defendants' motion for summary judgment (Docket # 56) is **GRANTED** as to defendants CAM, PRSOC, Báez, Martínez, and Alicea and claims against these defendants accordingly **DISMISSED** with prejudice. Defendants' motion for summary judgment is **DENIED** as to defendant Alonso.

**THEREFORE,** the following remain as defendants in this case: audition committee members Odón Alonso, José Figueroa, Joaquín Vidaechea, Federico Silva, Francisco Morlá, and Guillermo Figueroa.

The following motions are **MOOT:** Docket entries 71, 75, 78, 77, 89, 92, and 93. Partial judgment shall be entered accordingly.

**IT IS SO ORDERED.**